LAND, J.
 

 In April, 1922, Ferducy J. Waguespack, Nicholas J. Clesi, and Alfred J. Commagere entered into an agreement to purchase, subdivide, and develop a tract of land in the city of New Orleans, and to share equally in the profits to be derived from the sale of the' property. On or about May 9, 1922, this agreement was reduced to writing and signed by all of the contracting parties.
 

 The purport of the agreement was that Waguespack would advance the money -necessary to bind the sale of the property, that a corporation would be organized to take over the property, and that Waguespack, Clesi, and. Commagere would acquire in-equal proportions of one-third each the stock of the corporation, and thus share equally in the profits to flow from the transaction.
 

 Waguespack advanced the sum necessary to bind the sale. A corporation was duly organized under the name of the Realty Development Company Inc., and was capitalized at $5,000, or 50 shares at $100 each. Waguespack subscribed to 48 shares, and Clesi and Commagere to 1 share each.
 

 
 *944
 
 Subsequently, Waguespack transferred to Olesi and Commagere a sufficient number of shares to give to each sixteen and two-thirds shares, in pursuance of the agreement between them. The name of the corporation was changed later to the Guaranty Realty Company, Inc.
 

 The property in question was sold and transferred by the Orleans Anti-Tuberculosis League to the Realty Development Company, Inc.
 

 In promoting thé corporation and financing the sale and transfer of the property, Waguespack invested $25,000.
 

 It is alleged by Waguespack:
 

 That, in the latter part of September, 1922, he was advised by his associates that the entire enterprise was in danger of collapsing, with a total loss to each of them of the money which had been invested, unless additional capital could be secured, and that the amount needed would be between twenty and twenty-five thousand dollars.
 

 That petitioner was informed by his associates that they had found a fourth party who would furnish the company with necessary funds for financing, provided that each of them in the company would sell out to this party, who was willing to reimburse to each the amount then actually invested by him, and provided that the entire ownership, control, and profits ■ of the company should be turned over to this party.
 

 That the individual named by his associates was entirely ignorant of the use of his name in said connection, and that the entire .conduct'of his associates was in furtherance of a conspiracy to defraud petitioner of his share in the profits.
 

 That, in ignorance of the fraud and conspiracy thus being practiced upon him, and relying upon the false representations thus made by his associates, and fearing to lose the $25,000 which he had already invested in the enterprise, petitioner on the 7th day of October, 1922, was induced to enter into an agreement by authentic act, by the terms of which he was to be paid back $25,000 at the rate of $1,000 per month, with 7 per cent, interest.
 

 That each payment of $1,000, made to petitioner monthly by his associates, was made under the representation that the money was being furnished by the fourth individual, when, in truth and in fact, these payments were made by his associates out of the sales of lots into which the property had been subdivided, and that the proceeds of these sales would have been partly petitioner’s own money, had it not been for the fraudulent scheme on the part of his associates to induce petitioner to sign away his right and interest in said company.
 

 That during all of this period the associates of petitioner informed him that they also had been bought out by this fourth party, who was advancing all of the money necessary for the further development of the company’s tract of land, and who would receive all of the profits growing out of the transaction ; but that, so complete was the faith and confidence of petitioner in the honesty, integrity, and fairness of his associates, his partners in the enterprise, that he accepted as true every statement made to him, and acted throughout on their advice and upon their suggestions in signing the agreement in question.
 

 That the company disposed of all of the lots into which the property had been subdivided, and the total profits realized by the company out of the subdivision and sale amounted to $75,000, in which petitioner would have participated to the extent of one-third, or in the sum of $25,000, but for the fraudulent scheme
 
 *946
 
 and conspiracy upon the part of his associates.
 

 Petitioner avers that he remained in complete ignorance of the fraud that had been practiced upon him until the 15th day of October, 1927, when, in conversation with the individual whose name his associates had used as the fourth party, petitioner learned that this party was in utter ignorance that his name had been used in the transaction, and that said party had never had any interest in the property in question.
 

 Petitioner prays for judgment against Nicholas J. Clesi in the sum of $25,000, with legal interest from judicial demand, and alleges that Alfred J. Oommagere has left the state, and is now residing in the state of California, and that petitioner is unable to make Oommagere a party to this suit.
 

 From a judgment rejecting his demands, petitioner has appealed.
 

 Defendant denies the allegations of fraud made against him. In fact, these allegations are utterly inconsistent with the terms of the agreement entered into by petitioner on October 7, 1922, with the Realty Development Company, represented by Alfred J. Commagere, vice president. In this agreement, it is acknowledged in a notarial act that said company is indebted to petitioner in the sum of $25,000, to be liquidated by said company in monthly payments of $1,000; the first payment to be made on December 1, 1922, with 7 per cent, per annum interest on the amount paid from October 1,1922, to date of payment, with like amount of $1,000 to be paid each thirty days thereafter, with like interest on the amount paid from date, October 1, 1922, to date of payment.
 

 In other words, the agreement of October 7, 1922, was a sale made by petitioner direct to the Realty Development Company of all of his interest in that company for the sum of $25,000, every cent of which petitioner admits- that he has received.
 

 Neither the defendant, Clesi, nor Alfred J. Oommagere, pretended in this agreement to sell any of their interest in the company to the company, or to any one else. Nor did John Alonzo Woodville, the alleged fourth party, intervene in this agreement to accept the sale, and to bind himself for the payment of the purchase price of $25,000.
 

 It is inconceivable that a reasonable man would sign an agreement of this character if, as a matter of fact and truth, he had looked to a fourth party for the payment of the entire purchase price.
 

 It is still more incomprehensible that a reasonable man would not have investigated the truth of the alleged statement that Woodville was the party buying out the interest of all of the stockholders, and furnishing the funds for this purpose.
 

 Petitioner admits that he made no such investigation. He made no request of Wood-ville that he put up the cash, or that he indorse the note of the company. In fact, petitioner avers that he remained in blissful ignorance of the alleged fraud and conspiracy until October 15, 1927, when he states that he discovered the same accidentally and for the first time in a conversation with Wood-ville. Yet all of the checks which were given petitioner monthly in payment of the $25,009 are signed “Guaranty Realty Co. Inc. (Realty Development Company) Oommagere, President, N. J. Clesi, Treasurer.”
 

 Petitioner was the president of the company. He was asked by the trial judge:
 

 “Q. Do I understand that you were completely and utterly in the hands of these men and that you never exercised any judgment about anything, never made any inquiries about anything, and simply did what you
 
 *948
 
 were told to do by them? Will you tell me that?
 

 “A. Yes, sir.
 

 “Mr. Weiss: Q. You signed cheeks when you were told and the same way with contracts, minutes or anything else?
 

 “A. That is what I did.
 

 “Q. Although you had $20,000 or $25,000 invested in the company, you didn’t trouble yourself about anything connected with it all?
 

 “A. I had full faith and confidence in Commagere and Clesi. I trusted them.
 

 “The Court: Q. Why did you .permit yourself to be troubled by signing these documents? Why didn’t you have one of them authorized to sign contracts and checks? Why should yo,u be troubled to sign these documents, if you gave yourself no concern about them at all? Why did you sign whatever they asked you to sign that was put under your nose?
 

 “A. I simply signed what they asked me to sign. I trusted that everything was correct, the minutes, checks and contracts. I left it to them. I didn’t investigate or question their integrity or honesty.”
 

 The testimony of petitioner is so utterly lacking in business judgment and prudence that we feel satisfied that the trial judge was not impressed by it, nor are we impressed by it at all favorably.
 

 The defendant emphatically denies the charge of fraud made against him. The very terms of the agreement to sell show upon their face that the sale was made by petitioner to the Realty Development Company. Each monthly payment shows also upon its face that it was made to petitioner by that company. We attach, therefore, but little weight to the testimony of Victor Clesi, a cousin of defendant, and a former partner, that defendant admitted to him that the person to whom petitioner sold was John Alonzo Woodville, and that defendant had no interest in the company.
 

 The aforesaid witness admits that there was friction between him and defendant; that he was aggrieved because defendant went into several deals without letting him know anything about them; and that there were “private reasons” that he did not care to state on the stand.
 

 Besides, petitioner. has failed utterly to show that he received a single check signed by Woodville, in satisfaction of any payment made to him by defendant or by Commagere.
 

 A stenographer formerly employed in the oflice of Commagere, which was not the office of defendant, testified that she heard Commagere say to petitioner on several occasions, when he came for his monthly check: “Why, Woodville didn’t send it over. I will have to get in touch with Nick to see why Woodville didn’t send it over.”
 

 However, none of the other employees in the office of Commagere or of Clesi had ever heard the name of Woodville used over the telephone, although they had heard Commagere ring up the defendant on numerous occasions in regard to the payment of the monthly installments, and also had heard Commagere request extensions of payment because the company was hard pressed for funds.
 

 In fact, none of these other employees had heard the name of Woodville mentioned at all in connection with the purchase of the interest of petitioner.
 

 There is abundant testimony in the record to show that, after the purchase of petitioner’s interest, the defendant and Commagere were without funds to develop the property so as to place it on the market.
 

 
 *950
 
 But few lots were sold.until June 7, 1923, when a portion of the subdivision priced at $49,000 was purchased by Warner for $40,000 cash, and this was the salvation of the company, as testified to by defendant.
 

 The venture was naturally a speculative one, and, at the date of the sale by petitioner of his interest, it seemed as if his investment had been entirely lost. The company had no funds with which to develop the property and place it upon the market. This grave situation, assuredly, was not such as to invite a conspiracy to defraud petitioner of future profits.
 

 The defendant and Commagere, by the use of their personal credit, together with the sale of some of the lots, succeeded in tiding matters over until the real estate market revived. They assumed all of the risk, and were rewarded in the end by the profit.
 

 As questions of fact are involved, the decision in this case rests upon the credibility of the witnesses. As we do not find any manifest error in the findings of the trial judge, the judgment appealed from will not be disturbed.
 

 Judgment affirmed.
 

 ST. PAUL, J., dissents.